OPINION
PREGERSON, Circuit Judge:
Following the entry of a conditional guilty plea, Daniel Chovan appeals the district court’s denial of his motion to dismiss an indictment against him for violation of 18 U.S.C. § 922(g)(9). Section 922(g)(9) prohibits persons convicted of domestic violence misdemeanors from possessing firearms for life. Chovan contends that § 922(g)(9) is unconstitutional both on its *1130 face and as applied to him because it violates his Second Amendment right to bear arms. In the alternative, he argues that § 922(g)(9) does not apply to him because his civil rights have been restored within the meaning of 18 U.S.C. § 921(a)(33)(B)(ii). We have jurisdiction pursuant to 28 U.S.C. § 1291. We reject Chovan’s “civil rights restored” argument, hold that intermediate scrutiny applies to his Second Amendment claim, and uphold § 922(g)(9) under intermediate scrutiny.
FACTUAL & PROCEDURAL BACKGROUND
In 1996, Daniel Chovan was convicted in California state court of the misdemeanor of inflicting corporal injury on a spouse in violation of California Penal Code § 273.5(a). The victim, Cheryl Fix,[1] was living with Chovan at the time.[2] Chovan was sentenced to 120 days in jail and three years of supervised release.
Because of this conviction, Chovan was prohibited from possessing firearms under both state and federal law. Under California Penal Code § 12021(c)(1), which at the time applied to misdemeanants generally, Chovan was barred from owning, purchasing, receiving, or having in his possession or under his custody or control, any firearm for a ten-year period following his conviction. But under 18 U.S.C. § 922(g)(9), a federal statute that applies only to persons convicted of misdemeanor domestic violence crimes, Chovan was barred from possessing any firearm for life.
Section 922(g)(9) establishes two exceptions under which the statute will no longer apply: (1) “if the conviction has been expunged or set aside”; or (2) if the offender “has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense).” 18 U.S.C. § 921(a)(33)(B)(ii). These exceptions are not met if “the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.” Id.
In 2009, Chovan applied to purchase a firearm from a San Diego area gun dealer. He completed a required application form and answered “no” to the question whether he had ever been convicted of a misdemeanor crime of domestic violence. His purchase application was denied after a background check revealed his 1996 misdemeanor conviction of domestic violence. At the time of his application, Chovan could legally possess a firearm under California law because ten years had passed since his 1996 conviction, but § 922(g)(9) continued to bar him from possessing a firearm.
The FBI received information about Chovan’s attempted purchase and began investigating Chovan. During their investigation, FBI agents found videos on the Internet depicting Chovan and others shooting rifles and conducting “border patrols” near the U.S.-Mexico border.
The FBI also learned that in March 2010, San Diego County Sheriff deputies responded to a domestic dispute at Cho-van’s residence. Fix, Chovan’s then-estranged wife, told the officers that Chovan had become violent, hit her with a cell phone, and threatened to hunt her down and shoot her if she ever left him. Fix *1131 said that she believed Chovan’s threats because he had weapons inside his house.
On April 15, 2010, FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives agents executed a search warrant of Cho-van’s house. In the course of their search they found and confiscated four firearms, including a High Standard .22 caliber handgun that belonged to Chovan, and 532 rounds of assorted ammunition. Federal agents arrested Chovan the day after the search. During his arrest, Chovan admitted that he had possessed and fired the firearms several times since his 1996 domestic violence conviction. A two-count indictment was brought against Chovan. Count One alleged that Chovan had knowingly possessed firearms in violation of § 922(g), and Count Two alleged that he had made a false statement in the acquisition of a firearm in violation of 18 U.S.C. § 924(a)(1)(A).
Chovan moved to dismiss Count One, contending that (1) § 922(g)(9) is an unconstitutional violation of the Second Amendment; (2) his civil rights were “restored” within the meaning of § 921(a)(33)(B)(ii), and therefore § 922(g)(9) did not apply to him; and (3) § 922(g)(9)’s application to him was a violation of equal protection. The district court denied Chovan’s motion to dismiss, concluding that § 922(g)(9) “is a presumptively lawful prohibition and represents an exemption from the right to bear arms under the Second Amendment as articulated in [District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ].”
Chovan pled guilty to Count One of the indictment, pursuant to a conditional plea agreement that preserved his right to appeal the denial of his motion to dismiss.[3] Chovan was sentenced to five years probation. Chovan timely appealed the denial of his motion to dismiss.
STANDARD OF REVIEW
We review de noVo the constitutionality of a statute. United States v. Vongxay, 594 F.3d 1111, 1114 (9th Cir.2010). We also review de novo constitutional challenges to a district court’s denial of a motion to dismiss. Id.
DISCUSSION
Chovan argues on appeal that § 922(g)(9) violates the Second Amendment because it is an impermissible restriction on the individual and fundamental right to bear arms. He alternatively argues that § 922(g)(9) does not apply to him because his civil rights were restored when his ten-year ban on owning firearms under California state law expired, and thus that his conviction should be vacated. We disagree with both arguments.
I. Civil Rights Restored
We start by addressing Chovan’s non-constitutional argument that § 922(g)(9) does not apply to him because his civil rights have been restored.[4] Section 921(a)(33)(B)(ii) prevents the application of § 922(g)(9) in situations where a defendant’s “civil rights” have been restored. Chovan contends that his civil *1132 rights were restored within the meaning of § 921(a)(33)(B)(ii) when his right to own firearms was restored under California law ten years after his 1996 conviction.
Section 921(a)(33)(B)(ii) does not define the term “civil rights.” In United States v. Brailey, however, we addressed how to interpret the term. 408 F.3d 609, 611-13 (9th Cir.2005). In 1997, James David Brailey was cqnvicted in Utah of a misdemeanor crime of domestic violence. Id. at 610-11. As a result of this conviction, he was barred from possessing firearms under then-existing Utah state law. Id. at 611. In 2000, however, Utah amended its statutes such that Brailey and other mis-demeanants were no longer prevented from possessing firearms. Id. at 610-11. Brailey was subsequently charged with firearm possession in violation of § 922(g)(9). Id. at 610. He appealed the § 922(g)(9) conviction, maintaining that his civil rights had been restored within the meaning of § 921(a)(33)(B)(ii) because his right to possess a gun had been restored under Utah law. Id.
We rejected Brailey’s argument, concluding that his civil rights had never been “lost” because his misdemeanor conviction had not taken away his “core civil rights”: the right to vote, to sit as a juror, or to hold public office. Id. at 613. Because Brailey’s civil rights had never been lost, we reasoned that they could not have been restored. We noted that most other circuits had also concluded that, “where civil rights are not divested for misdemeanor convictions, a person convicted of a misdemeanor crime of domestic violence cannot benefit from the federal restoration exception.” Id. at 612 (citing United States v. Jennings, 323 F.3d 263 (4th Cir.2003); United States v. Barnes, 295 F.3d 1354 (D.C.Cir.2002); United States v. Smith, 171 F.3d 617 (8th Cir.1999)); see also Logan v. United States, 552 U.S. 23, 37, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007) (holding that a different “civil rights restored” exception did not apply to “an offender who lost no civil rights”). Thus, we concluded that Brailey failed to meet § 922(g)(9)’s civil rights restored exception.
Chovan argues that Brailey’s reading of the civil rights restored exception is too narrow and “create[s] an equal protection problem.” According to Chovan it is unfair that under Brailey, individuals who lose the right to vote, serve on a jury, or hold public office because of their convictions but later have these rights restored can possess firearms, while individuals like Chovan who never lost these rights cannot.
Chovan’s equal protection argument is foreclosed by our decision in United States v. Hancock, 231 F.3d 557 (9th Cir.2000). In 1994 and 1995, Gary Hancock was convicted of four Arizona state misdemeanors involving violence or threats of violence against his wife. Id. at 560. In 1999, Hancock was convicted of possessing a firearm in violation of § 922(g)(9). Id. On appeal, Hancock argued that his indictment should have been dismissed on equal protection grounds. Id. at 565. He argued that in Arizona, domestic violence misdemeanants are treated more harshly under § 922(g)(9) than felons because Arizona misdemeanants, unlike felons, are not deprived of their civil rights and as a result can never have their civil rights restored. Id. at 566.
Applying rational basis review, we rejected Hancock’s equal protection claim. Id. at 566-67. First, we explained that when Congress enacted § 922(g)(9), it “was aware of the discrepancies in state procedures for revoking and restoring civil rights.... [Disparate treatment of some offenders was the inevitable result of Congress’ decision to ‘look to state law to define the restoration exception.’ ” Id (citing United States v. Smith, 171 F.3d 617, *1133 625 (8th Cir.1999)). Second, we noted that in addition to the civil rights restored exception, § 922(g)(9) provides “several adequate legal mechanisms” for which both misdemeanants and felons can qualify: “pardon, expungement, and setting aside of convictions.” Id. at 567. Viewing the two exceptions together, we found that “Congress reasonably could conclude that felons who had been through a state’s restoration process and had regained their civil rights ... were more fit to own firearms than domestic-violence misdemean-ants who had not had their convictions expunged or been pardoned.” Id. We therefore upheld the civil rights restored exception under rational basis review as at least “minimally rational.” Id.
Here, we apply Brailey and conclude that Chovan’s 1996 misdemeanor domestic violence conviction did not divest him of civil rights because it did not divest him of the right to vote, the right to serve on a jury, or the right to hold public office. Because Chovan never lost these “core” civil rights, he cannot qualify for the civil rights restored exception to § 922(g)(9). Further, we reject Chovan’s argument that the civil rights restored exception violates the Equal Protection Clause for the same reasons we articulated in Hancock. Id. at 566-67.
II. Second Amendment Challenge
Having concluded that Chovan does not qualify for the “civil rights restored” exception, we turn to his Second Amendment challenge to § 922(g)(9). Chovan’s Second Amendment argument is predicated on the Supreme Court’s holding in District of Columbia v. Heller that the Second Amendment protects “an individual right to keep and bear arms.” 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).
In Heller; the Supreme Court struck down District of Columbia laws banning handgun possession in the home and requiring all firearms in homes to be unloaded and disassembled or “bound by a trigger lock or similar device.” Id. at 630, 635, 128 S.Ct. 2783. While the Heller Court declined to “undertake an exhaustive historical analysis ... of the full scope of the Second Amendment,” it did establish that the individual right guaranteed by the amendment is “not unlimited.” Id. at 626-27, 128 S.Ct. 2783.
The Heller Court suggested that the core of the Second Amendment right is to allow “law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 635, 128 S.Ct. 2783. The Court indicated that determining the scope of the Second Amendment’s protections requires a textual and historical analysis of the amendment. See id. at 576-605, 128 S.Ct. 2783. Finally, the Court established that “weapons not'typically possessed by law-abiding citizens for lawful purposes” are not protected by the Second Amendment, id. at 625, 128 S.Ct. 2783, and that certain “longstanding prohibitions” are “presumptively lawful regulatory measures”:
[Njothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
Id. at 626-27, 128 S.Ct. 2783; see also id. at 627 n. 26, 128 S.Ct. 2783; McDonald v. City of Chicago, 561 U.S. -, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010).
The constitutionality of § 922(g)(9) is a question of first impression in this circuit, although a number of other circuits have upheld the statute using varying rationales. We briefly summarize the different approaches taken by these circuits.
*1134 A. Approaches Taken By Other Circuits

1. Upheld as a “Presumptively Lawful Longstanding Prohibition”: Eleventh Circuit

The Eleventh Circuit considered the constitutionality of § 922(g)(9) and upheld it as a “presumptively lawful longstanding prohibition[ ].” United States v. White, 593 F.3d 1199, 1205 (11th Cir.2010). That court analogized § 922(g)(9) to the felon-in-possession ban the Heller Court listed as a presumptively lawful restriction, noting that “although passed relatively recently, § 922(g)(9) addresses the thorny problem of domestic violence, a problem Congress recognized as not remedied by ‘longstanding’ felon-in-possession laws.” Id. at 1206. Concluding that “Heller does not cast doubt” on § 922(g) (9)’s constitutionality because § 922(g)(9) is a presumptively lawful prohibition, and without further constitutional analysis, the Eleventh Circuit upheld the statute. Id.
Two other circuits have criticized White’s approach. In United States v. Chester, the Fourth Circuit stated that “for all practical purposes” White treats “Heller’s listing of presumptively lawful measures” as a sort of “safe harbor for unlisted regulatory measures, such as 28 U.S.C. § 922(g)(9)” that are “analogous to those measures specifically listed in Heller.” 628 F.3d 673, 679 (4th Cir.2010). The Chester court criticized the approach as “approximating] rational-basis review, which has been rejected by Heller.” Id. In United States v. Skoien, the Seventh Circuit sitting en banc declined to address whether § 922(g)(9) is presumptively lawful, stating, “We do not think it profitable to parse the[ ] passages of Heller [that list presumptively lawful measures] as if they contained an answer to the question whether § 922(g)(9) -is valid.” 614 F.3d 638, 640 (7th Cir.2010) (en banc).

2. Remanded to District Court to Apply Intermediate Scrutiny: Fourth Circuit

In Chester, the Fourth Circuit considered William Samuel Chester’s argument that his § 922(g)(9) conviction abridged his right to keep and bear arms under the Second Amendment. 628 F.3d at 674. The court held first that a two-part inquiry applies to Second Amendment claims:
The first question is “whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” ... If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.
Id. at 680 (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir.2010)). After canvassing the historical evidence on the Second Amendment rights of domestic violence misdemeanants and finding it “inconclusive,” the court stated, “We must assume, therefore, that Chester’s Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense.” Id. at 681-82.
In its discussion of the second step— whether the challenged regulation survives the appropriate level of scrutiny — -the Fourth Circuit noted that the Heller Court left open the question of what level of scrutiny applies to a law burdening Second Amendment-protected conduct, although the Court made clear that rational basis review was not sufficient. Id. at 682. The Chester court went on to state:
Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identi- *1135 fled in Heller — the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense — by virtue of Chester’s criminal history as a domestic violence misdemeanant. Heller, [554 U.S. at 635, 128 S.Ct. 2783]. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.
Id. at 682-83. The Chester court found that the government had not “carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)’s permanent disarmament of all domestic-violence misdemeanants,” and it therefore remanded the case to afford the parties the opportunity to present evidence on this question in the first instance. Id. at 683.

3. Upheld After Application of Intermediate or Heightened Scrutiny: First, Fourth, and Seventh Circuits

In United States v. Skoien, the Seventh Circuit sitting en banc upheld § 922(g)(9) after assuming that intermediate scrutiny or its equivalent applied, and therefore that an “important governmental objective” and “substantially related” means were necessary to uphold the statute. 614 F.3d at 641-42. The Seventh Circuit examined a number of studies supporting the relationship between § 922(g)(9) and the important government interest of preventing gun violence. Id. at 642-44. The court noted, for example, that it is established that “firearms cause injury or death in domestic situations,” and that “[domestic assaults with firearms are approximately twelve times more likely to end in the victim’s death than are assaults by knives or fists.” Id. at 643 (citing Linda E. Saltz-man, James A. Mercy, Patrick W. O’Carroll, Mark L. Rosenberg & Philip H. Rhodes, Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Am. Med. Ass’n 3043 (1992)). The court also noted that “[t]he presence of a gun in the home of a convicted domestic abuser is ‘strongly and independently associated with an increased risk of homicide.’ ” Id. (quoting Arthur L. Kellermann, et al.; Gun Ownership as a Risk Factor for Homicide in the Home, 329 New England J. Med. 1084, 1087 (1993)). In light of “[b]oth logic and data,” the Seventh Circuit held that keeping guns from domestic violence misdemeanants is substantially related to the government interest of preventing gun violence. Id. at 642.
The Skoien court also held that § 922(g)(9) was constitutional as applied to Skoien. Id. at 645. Skoien contended that § 922(g)(9) was not substantially related to an important government objective because it “perpetually]” disqualifies all persons convicted of domestic violence, even people who had not been in legal trouble for many years. Id. at 644. The eoürt rejected Skoien’s argument, emphasizing the statute’s exceptions under which domestic violence misdemeanants may regain their rights to possess firearms. The court also noted,
Skoien is poorly situated to contend that the statute creates a lifetime ban for someone who does not pose any risk of further offenses [because] Skoien is himself a recidivist, having been convicted twice of domestic battery.... A person to whom a statute properly applies can’t obtain relief based on arguments that a differently situated person might present.
Id. at 645 (citing United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).
The First Circuit similarly upheld § 922(g)(9) after applying the equivalent of intermediate scrutiny. United States v. Booker, 644 F.3d 12, 25 (1st Cir.2011). The Booker court - found that while § 922(g)(9) “appears consistent with Hel- *1136 lev’s reference to certain presumptively lawful regulatory measures,” any “categorical ban on gun ownership by a class of individuals must be supported by some form of ‘strong showing,’ necessitating a substantial relationship between the restriction and an important governmental objective.” Id. at 25. The court upheld § 922(g)(9) after concluding that social science research supported a finding of “a substantial relationship between § 922(g)(9)’s disqualification of domestic violence misdemeanants from gun ownership and the governmental interest in preventing gun violence in the home.” Id.
Finally, the Fourth Circuit in United States v. Staten considered the constitutionality of § 922(g)(9) on a full record after its decision in Chester. Unlike in Chester, where the court remanded the application of intermediate scrutiny to the district court because the record was incomplete, in Staten the court upheld § 922(g)(9) under intermediate scrutiny. 666 F.3d 154, 167 (4th Cir.2011). The Staten court first held that the government had carried its burden of establishing that reducing domestic gun violence is a substantial government objective. Id. at 161. The court then examined the social science studies cited by the government and found that the government had established that:
(1) domestic violence is a serious problem in the United States; (2) the rate of recidivism among domestic violence mis-demeanants is substantial; (3) the use of firearms in connection with domestic violence is all too common; (4) the use of firearms in connection with domestic violence increases the risk of injury or homicide during a domestic violence incident; and (5) the use of firearms in connection with domestic violence often leads to injury or homicide.
Id. at 167. The court concluded that the government had therefore “carried its burden of establishing a reasonable fit between the substantial government objective of reducing domestic gun violence and keeping firearms out of the hands of [domestic violence misdemeanants]”. Id.
B. Chovan’s Second Amendment Challenge
After considering the. approaches taken by other circuits that considered the constitutionality of § 922(g)(9), we hold as follows. We adopt the two-step Second Amendment inquiry undertaken by the Third Circuit in Marzzarella, 614 F.3d at 89, and the Fourth Circuit in Chester, 628 F.3d at 680, among other circuits. Applying that inquiry, we hold that § 922(g)(9) burdens conduct falling within the scope of the Second Amendment’s guarantee and that intermediate scrutiny applies to Cho-van’s Second Amendment challenge. Finally, like the First, Fourth, and Seventh Circuits, we apply intermediate scrutiny to § 922(g)(9) and .hold that it is constitutional on its face and as applied to Chovan.

1. The Two-Step Inquiry

The two-step Second Amendment inquiry we adopt (1). asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny. Chester, 628 F.3d at 680; see also Marzzarella, 614 F.3d at 89.
We believe this two-step inquiry reflects the Supreme Court’s holding in Heller that, while the Second Amendment protects an individual right to keep and bear arms, the scope of that right is not unlimited. 554 U.S. at 626-27, 128 S.Ct. 2783. The two-step inquiry is also consistent with the approach taken by other circuits considering various firearms restrictions post-Heller. See, e.g., Heller v. District of Columbia, 670 F.3d 1244, 1251-58 (D.C.Cir.2011) (“Heller II”); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir.2011); United States v. Reese, 627 F.3d *1137 792, 800-05 (10th Cir.2010). We join the Third, Fourth, Seventh, Tenth, and D.C. Circuits in holding that the two-step framework outlined above applies to Second Amendment challenges.

2. Applying the Two-Step Inquiry: Section 922(g)(9) Affects. Second Amendment Rights and Intermediate Scrutiny Applies

At the first step of the inquiry, we conclude that by prohibiting domestic violence misdemeanants from possessing firearms, § 922(g)(9) burdens rights protected by the Second Amendment.
Section 922(g)(9) is not mentioned in Heller. The government argues that § 922(g)(9) is a presumptively lawful' regulatory measure and does not burden rights historically understood to be protected by the Second Amendment. According to the government, § 922(g)(9) is part of a “long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent.”
We do not agree. First, it is not clear that such prohibitions are so longstanding. The first federal firearm restrictions regarding violent offenders were not passed until 1938, as part of the Federal Firearms Act. See C. Kevin Marshall, Why Can’t Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol’y 695, 698, 708 (2009) (noting that “one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I”). Second, and more importantly, the government has not proved that domestic violence misdemeanants in particular have historically been restricted from bearing arms. The Federal Firearms Act of 1938 only restricted firearm possession for those individuals convicted of a “crime of violence,” defined as “murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking, and certain forms of aggravated assault — assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.” Id. at 699 (internal quotation marks omitted). Domestic violence misdemeanants— like Chovan, who was convicted of simple misdemeanor assault under California Penal Code § 273.5(a) — would not be restricted from possessing firearms under the Federal Firearms Act. In fact, domestic violence misdemeanants were not restricted from possessing firearms until 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968. Pub.L. No. 104-208, § 658, 110 Stat. 3009, 3009-371 (1996).
Because of “the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that [Chovanj’s Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense.” Chester, 628 F.3d at 681-82.
We now reach the second step of the Second Amendment inquiry. In Heller, the Supreme Court did not specify what level of scrutiny courts must apply to a statute challenged under the Second Amendment. The Heller Court did, however, indicate that rational basis review is not appropriate. See Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783 (“If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.”). Having concluded that § 922(g)(9) burdens Second Amendment rights, we reject rational basis review and conclude that some sort of heightened scrutiny must apply.
*1138 In determining the appropriate level of scrutiny, other circuit courts have looked to the First Amendment as a guide. See, e.g., Chester, 628 F.3d at 682; Marzzarel-la, 614 F.3d at 89 n. 4, 96-97; Ezell, 651 F.3d at 703, 707. We agree with these courts’ determination that, just as in the First Amendment context, the level of scrutiny in the Second Amendment context should depend on “the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” See Chester, 628 F.3d at 682; see also Marzzarella, 614 F.3d at 96-97. More specifically, the level of scrutiny should depend on (1) “how close the law comes to the core of the Second Amendment right,” and (2) “the severity of the law’s burden on the right.” Ezell, 651 F.3d at 703.
Heller tells us that the core of the Second Amendment is “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U.S. at 635, 128 S.Ct. 2783. Section 922(g)(9) does not implicate this core Second Amendment right because it regulates firearm possession for individuals with criminal convictions. “Although [Chovan] asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in Heller — the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense — by virtue of [Chovan]’s criminal history as a domestic violence misdemeanant.” Chester, 628 F.3d at 682-83; cf. Ezell, 651 F.3d at 708 (finding that a challenged statute implicated the core Second Amendment right because “the plaintiffs are the ‘law-abiding, responsible citizens’ whose Second Amendment rights are entitled to full solicitude under Heller ”).
The burden the statute places on domestic violence misdemeanants’ rights, however, is quite substantial. Unlike the regulations in Marzzarella or Heller II, § 922(g)(9) does not merely regulate the manner in which persons may exercise their Second Amendment rights. Cf. Marzzarella, 614 F.3d at 97 (concluding that obliterated serial numbers regulation “does not severely limit the possession of firearms” because “[i]t leaves a person free to possess any otherwise lawful firearm he chooses”); Heller II, 670 F.3d at 1258 (reasoning that the District of Columbia’s gun registration requirements were not a severe burden because they do not “prevent[ ] an individual from possessing a firearm in his home or elsewhere”). Instead, as Chovan argues, § 922(g)(9) amounts to a “total prohibition” on firearm possession for a class of individuals — in fact, a “lifetime ban.” As such, the statute is a more “serious encroachment” on the Second Amendment right. See Ezell, 651 F.3d at 708. But Chovan goes too far when he argues that § 922(g)(9) is too broad because it “contains no provision limiting its applicability.” As explained above, § 922(g)(9) exempts those with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored. Therefore, while we recognize that § 922(g)(9) substantially burdens Second Amendment rights, the burden is lightened by these exceptions.
In sum, § 922(g)(9) does not implicate the core Second Amendment right, but it does place a substantial burden on the right. Accordingly, we conclude that intermediate rather than strict scrutiny is the proper standard to apply.[5]

*1139
S. Applying Intermediate Scrutiny, We Uphold § 922(g)(9) and Its Application to Chovan

Although courts have used various terminology to describe the intermediate scrutiny standard, all forms of the standard require (1) the government’s stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective. Chester, 628 F.3d at 683. As we explain below, § 922(g)(9), both on its face and as applied to Chovan, survives intermediate scrutiny.

a. Important Government Interest

Chovan concedes that § 922(g)(9) was motivated by the important government interest of “keeping firearms away from those most likely to misuse them” or “preventing gun violence.” We agree that § 922(g)(9) advances an important government objective, but define the objective slightly more narrowly, as preventing domestic gun violence.
That _ the government interest behind § 922(g)(9) was to prevent domestic gun violence is apparent from the face of the statute and its legislative history. As the government explains, the 1996 passage of § 922(g)(9) was motivated by the concern that guns were not being kept away from domestic abusers under felon-in-possession laws because “many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies.” Skoien, 614 F.3d at 643 (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg) (internal quotation marks omitted)); see also United States v. Hayes, 555 U.S. 415, 426, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009); United States v. White, 593 F.3d 1199, 1205 (11th Cir.2010). Through § 922(g)(9), Congress sought to “close this dangerous loophole” and “establish!;] a policy of zero tolerance when it comes to guns and domestic violence.” Booker, 644 F.3d at 16 (quoting 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (internal quotation marks omitted) (emphasis added)). Thus, the legislative history of § 922(g)(9) shows that Congress did not enact the statute for the purpose of “preventing gun violence,” as Chovan argues. Instead, Congress passed § 922(g)(9) to prevent domestic gun violence.
We and other circuits have previously defined the government interest behind § 922(g)(9) in this way. In United States v. Belless, we noted that the purpose of § 922(g)(9) is “to keep firearms out of the hands of people whose past violence in domestic relationships makes them untrustworthy custodians of deadly force.” 338 F.3d 1063, 1067 (9th Cir.2003). In Booker, the First Circuit similarly defined the interest behind § 922(g)(9) as “keeping guns away from people who have been proven to engage in violence with those with whom they share a domestically intimate or familial relationship, or who live with them or the like.” 644 F.3d at 25. Finally, in Staten, the Fourth Circuit defined the interest behind § 922(g)(9) as “reducing domestic gun violence.” 666 F.3d at 161 (emphasis added).
It is self-evident that the government interest of preventing domestic gun violence is important. See Booker, 644 F.3d at 25 (“[K]eeping guns away from people who have been proven to engage in [domestic] violence ... is undeniably impor- *1140 taut.” (citing Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (“The State’s interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.”))). ■ We hold that the government has met its burden to show that reducing domestic gun violence is an important government objective.

b. Substantially Related to Government Interest

Keeping guns from domestic violence misdemeanants is substantially related to the broader interest of preventing domestic gun violence for four related reasons. First, we agree with the government that 'the legislative history indicates that Congress enacted § 922(g)(9) because it sought to reach the people who had demonstrated violence, but were not kept from possessing firearms by § 922(g)(1) because domestic abusers are not often convicted of felonies. See Hayes, 129 S.Ct. at 1087.
Second, we agree with the government that “a high rate of domestic violence recidivism exists.” The government relies on Skoien, in which the Seventh Circuit pointed to a number of studies estimating a rate of domestic violence recidivism between 35% and 80%. See Skoien, 614 F.3d at 643-44. Estimates of “[t]he full recidivism rate,” which “includes violence that does not lead to an arrest,” “range from 40% to 80% ’when victims are followed longitudinally and interviewed directly.’ ” 614 F.3d at 644 (citing Carla Smith Stover, Domestic Violence Res., 20 J. Interpersonal Violence 448, 450 (2005)). The Skoien court also cited two other studies that estimated the full recidivism rate to be 35% and 52%, respectively. Id. (citing Julia C. Babcock, et ah, Does Batterers’ Treatment Work? A Metar-Analytic Review of Domestic Violence Treatment, 23 Clinical Psychol. Rev. 1023, 1039 (2004) (estimating a 35% recidivism rate based on partners’ reports); John H. Laub & Robert J. Sampson, Understanding Desistance from Crime, 28 Crime & Just. 1, 31 (2001) (estimating that only 48% of domestic abusers “suspended” their abusive conduct within three years of conviction)).
Third, we agree with the government that domestic abusers use guns. The government explains that “Congress acknowledged that the use of guns in incidents of domestic violence was a compelling concern,” and cites to the Congressional Record in which Congress found that “annually, over 150,-000 incidents of domestic violence involve a gun.” See United States v. Smith, 742 F.Supp.2d 855, 867 (S.D.W.Va.2010) (citing Cong. Rec. 22,-986). The government further relies on the fact, articulated in Booker, that “nearly 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders.” Booker, 644 F.3d at 26.
Finally, we agree with the government that the use of guns by domestic abusers is more likely to result in the victim’s death. The government cites a medical study relied upon in Skoien for the proposition that incidents of domestic violence involving firearms are twelve times more likely to end in the victim’s death than incidents where a perpetrator is either unarmed or armed with a knife alone. See Skoien, 614 F.3d at 643 (citing Linda E. Saltzman, James A. Mercy, Patrick W. O’Carroll, Mark L. Rosenberg & Philip H. Rhodes, Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Am. Medical Ass’n 3043 (1992)).
Putting these four conclusions together, the government has demonstrated that domestic violence misdemeanants are likely to commit acts of domestic violence again and that, if they do so with a gun, the risk of death to the victim is signifi *1141 cantly increased. We hold that the government has thereby met its burden to show that § 922(g)(9)’s prohibition on gun possession by domestic violence misde-meanants is substantially related to the important government interest of preventing domestic gun violence. Because § 922(g)(9) is supported by an important government interest and substantially related to that interest, the statute passes constitutional muster under intermediate scrutiny.
c. Chovan’s As-Applied Challenge
Chovan argues that § 922(g)(9) is unconstitutional as applied to him because his 1996 domestic violence conviction occurred fifteen years before his § 922(g)(9) conviction, he is unlikely to recidivate, and he has in fact been law-abiding for those fifteen years.
Chovan cites several statistics in support of his argument that he is at low risk of recidivism. He cites the Sentencing Commission’s Measuring Recidivism study, which establishes that those with stable employment are less likely to recidivate and that “ ‘[rjecidivism is comparatively low for the lowest sentences (less than six months or probation).”’ See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12, 14. He also cites a National Institute for Justice study for the proposition that people who remain offense free for as long as Mr. Chovan (and indeed for much shorter periods) pose a recidivism risk equal to that of the general population. See Blumstein & K. Nakamura, ‘Redemption’ in an Era of Widespread Criminal Background Checks, NIJ Journal, June 2009, at 10.
But the Sentencing Commission statistics do not reveal the actual rate of recidivism for those with stable employment or short sentences; the statistics only establish that individuals in those two categories have comparatively lower recidivism rates than individuals in other categories. Measuring Recidivism at 14. Moreover, none of Chovan’s statistics has to do with individuals convicted of domestic violence crimes specifically. The National Institute for Justice study mentions only burglary, robbery, and aggravated assault; it does not mention domestic violence, rior does it make conclusions about individuals convicted of crimes generally. ‘Redemption’ at 12. Meanwhile, the government has referred to domestic violence studies mentioned by the Skoien court showing that the recidivism rates for individuals convicted of domestic violence is significant — between 35 and 80 percent. See Skoien, 614 F.3d at 643-44.
Chovan also argues that he has not been arrested for domestic violence since the 1996 conviction and has otherwise been law-abiding. He argues that a March 2010 domestic violence call made by his estranged wife and victim of the act of domestic violence underlying the 1996 conviction, Cheryl Fix, should not be held against him because it did not result in a charge or even arrest and amounts to “unsubstantiated allegations.” When San Diego County Sheriff deputies responded to the call, Fix told them that Chovan had become violent with her, struck her with a cell phone, and threatened to hunt her down and shoot her if she ever left him.
Although Chovan was not arrested for domestic violence, we nonetheless consider the March 2010 domestic abuse call and Fix’s statements. The call is part of the record. And it should be considered, especially in light of one of the underlying rationales of § 922(g)(9): acts of domestic violence are under-reported and often do not lead to arrest or conviction. See Skoien, 614 F.3d at 643 (explaining that in enacting § 922(g)(9) Congress recognized that the felon-in-possession ban did not *1142 keep guns away from domestic abusers because many domestic abusers are never charged with or convicted of felonies (quoting 142 Cong. Rec. 22,985 (1996) (statement of Sen. Lautenberg))). The March 2010 domestic abuse call supports the conclusions that Chovan is at risk of recidivism for domestic violence and-that Cho-van might use a gun to commit future domestic violence. In light of the domestic abuse call, § 922(g)(9)’s application to Cho-van is substantially related to the goal of reducing domestic gun violence.
But even if we were to set aside the March 2010 domestic abuse call and assume that Chovan has had no history of domestic violence since 1996, Chovan has not presented evidence to directly contradict the government’s evidence that the rate of domestic violence recidivism is high. Nor has he directly proved that if a domestic abuser has not committed domestic violence for fifteen years, that abuser is highly unlikely to do so again. In the absence of such evidence, we conclude that the application of § 922(g)(9) to Chovan is substantially related to the government’s important interest of preventing domestic gun violence.
Finally, we note that if Chovan’s as-applied challenge succeeds, a significant exception to § 922(g)(9) would emerge. If Congress had wanted § 922(g)(9) to apply only to individuals with recent domestic violence convictions, it could have easily created a limited duration rather than lifetime ban. Or it could have created a good behavior clause under which individuals without new domestic violence arrests or charges within a certain number of years of conviction would automatically regain their rights to possess firearms. But Congress did not do so. Congress permissibly created a broad statute that only excepts those individuals with expunged, pardoned, or set aside convictions and those individuals who have had their civil rights restored. See Skoien, 614 F.3d at 641 (“[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.”). The breadth of the statute and the narrowness of these exceptions reflect Congress’s express intent to establish a “zero tolerance policy” towards guns and domestic violence.
Because the application of § 922(g)(9) to Chovan is substantially related to the government’s important interest of preventing domestic gun violence, Chovan’s as-applied challenge fails.
CONCLUSION
For the foregoing reasons, we reject Chovan’s “civil rights restored” claim, hold that intermediate scrutiny is the proper standard to apply to his Second Amendment claim, and uphold § 922(g)(9) and its application to Chovan under intermediate scrutiny. AFFIRMED.

. Fix married Chovan in 1997 and changed her last name to "Chovan.” We refer to her as Fix throughout this opinion for the sake of clarity. Fix and Chovan separated in 2009.

. California Penal Code § 273.5(a) does not require that the parties be married, but rather applies to any person who willfully inflicts corporal injury "upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child____”

. Count Two was dismissed as a part of the plea agreement and is not at issue in this appeal.

. See Dep’t of Commerce v. United States House of Representatives, 525 U.S. 316, 343-44, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (citing Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.”)).

. Most courts have also found that intermediate scrutiny or its equivalent is the proper standard to apply to Second Amendment challenges to § 922(g)(9) and similar statutes. See, e.g., Booker, 644 F.3d at 25; Chester, 628 F.3d at 682-83; Marzzarella, 614 F.3d at 97 (applying intermediate scrutiny to Second Amendment challenge of 18 U.S.C. § 922(k), *1139 a ban on possession of firearms with obliterated serial numbers); Reese, 627 F.3d at 802 (applying intermediate scrutiny to Second Amendment challenge of 18 U.S.C. § 922(g)(8), which bans the possession of firearms by those subject to domestic protection orders); Heller II, 670 F.3d at 1257 (applying intermediate scrutiny to District of Columbia’s firearm registration requirements).